[No. 1974.]

### REUBEN FITZGERALD *v.* THE STATE.

RAPE — FACT CASE.— See the statement of the case for evidence *held* sufficient to support a conviction for rape, and also for a charge to the jury in a trial for rape by force and threats, which elicits the approval and commendation of this court.

APPEAL from the District Court of Coryell. Tried below before the Hon. T. L. Nugent.

The conviction in this case was for the rape of Ida Turk, in Coryell county, Texas, on the 30th day of May, 1885, by means of force and threats. The penalty assessed against the appellant was a life term in the penitentiary.

Miss Ida Turk was the first witness for the State. She testified at great length, her evidence covering twenty-three pages of the transcript. She stated, in substance, that she was an orphan, twenty years of age, the only child of her father and mother, and from birth had been a cripple from a spinal affection. Her mother died when she was three years of age. Six years later her father married Melissa Stalls, and, three years before this trial, died in Coryell county. Witness lived with her step-mother for the six months succeeding her father's death, and then went to reside with her aunt, Mrs. Smith, in Travis county. She remained at her aunt's in Travis county about eighteen months, when she returned to her old home in Coryell county, which was occupied by the defendant, who in the meantime had married her step-mother. Witness's father left two children by his second wife, Melissa, one of whom had since died. The survivor was a boy about six years old. Witness's father, at

his death, left a homestead of one hundred and sixty acres in Coryell county, the same on which he and witness were living at the time he married Melissa.   When the witness returned to Coryell county from Travis county in August, 1884, she went to her old home, and lived with the defendant and his wife, the witness's step-mother, until six or seven weeks prior to this trial.   Late in the fall of 1884 the defendant began to conduct himself towards witness in a very friendly, attentive and affectionate manner, and continued to do so until March, 1885.   He would kiss the witness, play with her, and pull her into his lap.   He practiced these attentions in the presence of his wife.   Witness at first resented those liberties, but finally raised no objection, inasmuch as she was led to believe by the demeanor of the defendant and her step-mother's apparent non-concern that the defendant had no ulterior designs upon her.   In March, 1885, witness learned that the defendant had circulated reports injurious to her character, and she decided to leave his house.   She wrote to her uncle and aunt in Travis county, asking them to come for her, and in the meantime, after applying to several neighbors, she succeeded in making arrangements to reside at the house of Mr. Dick Adams pending the arrival of her relatives.   Having arranged to take up her temporary abode at Mr. Adams's house, witness returned to defendant's house and told her step-mother that, in consequence of the defendant's slanderous talk about her, she had written to her relatives to come for her, and she would remove to Mr. Adams's to abide their arrival.   Mrs. Fitzgerald replied that it would never do for the witness to precipitate a family scandal by any such step as that; that she could scarcely believe the defendant capable of such conduct, and would interview him on the subject. On the night before the day set for witness's removal to Mr. Adams's, Mrs. Fitzgerald asked defendant, in witness's presence, about the scandalous statements imputed to him.   He denied, vehemently, that he was guilty.   Witness yielded to the appeals of the two, and abandoned her purpose of going to Adams's,— partly because she was averse to further family dissension and scandal, and partly because she hopefully expected her uncle to come for her soon.

Defendant's conduct towards the witness was irreproachable for a while after she consented to remain at the house, but he finally renewed his attempts to practice familiarities with her, and she finally repulsed him, and again wrote to her relatives in Travis county to come or send for her.   Defendant persisted in his attempts to subject witness to his caresses until about the first Sunday in April, when she went to church with a young man named Perry Cade.

When she and Cade returned at noon the house was closed and the family absent. Witness and Cade went to the house of Mr. Pennington, about a half mile distant, and remained until 5 o'clock, when they returned, and found the house still closed. Rain began to fall and witness directed Mr. Cade to open the window, climb in and open the house, which he did, and witness went in. Within fifteen minutes the defendant arrived, and a few minutes later Mr. Cade left, and witness went to the house of Mr. Bowling, where her step-mother then was. But before she started to Bowling's defendant told her that Cade had violated the law in entering the house, and that the grand jury could handle the witness roughly for her part in the house-breaking. He then asked what witness supposed her step-mother would think of her going into the house with Cade. Witness replied that she did not know, and that, at all events, she did not think it wrong for her to go into her own house. A few days later the defendant reverted to the house-breaking, made an indecent proposal to witness, and told her that he would report her to the grand jury for house-breaking, and secure her a term in the penitentiary, if she did not yield her person to his use. Witness reported this threat of prosecution to Mr. E. Adams, but said nothing to him about defendant's improper proposals. About this time the witness received a letter from her uncle promising to come for her about the 1st of June. Witness wanted to go to Travis county herself, after the defendant's threat and indecent proposal, and asked defendant and her step-mother to furnish her the necessary funds. She had no one else to appeal to. Defendant had told her that Mr. Bowling's people had said that she should not come on his place; that Mr. Pennington had forbidden his daughters associating with her, and that the neighbors generally had cast her off, the one exception being the "Adamses, who were nobodies." Money was refused the witness, but defendant proposed to buy her a pony to ride to Travis county, and to take her to Gatesville and buy her a ticket. Witness declined these proffers, because she knew that she could not get to her uncle's on the pony, and that one ticket would not take her through from Gatesville. Defendant continued his importunities for improper relations with witness, his threats about the house-breaking, and his comments upon the witness's loss of character, notwithstanding which the witness, being under no apprehension that defendant would ravish her, or forcibly know her against her consent, remained at the house awaiting the arrival of her uncle.

The household retired about an hour after dark on the night of

May 29, 1885. Witness slept in a double bed in the northeast corner of the main room. The foot of that bed extended towards the foot of the bed in the southeast corner of the same room, which was occupied by the defendant, his wife and child. The foot boards of the two beds were about two and a half feet apart. The fire-place was in the west end of the room. About midnight the defendant awakened the witness by placing his hands on her shoulder or arm. Witness got out of her bed over the foot, and got into her step-mother's bed, behind her step-mother, and next to the wall. Her step-mother appeared to be asleep and did not move. Defendant told witness three times to go back to her bed. He then went to the bed and in passing touched his wife's feet and awakened her, and she asked defendant what he was doing up and what he wanted. He replied: "I want you to make that d—d little heifer go back to her own bed and behave herself." Mrs. Fitzgerald replied: "You go back to your bed and behave yourself, and she will do the same." Defendant said: "I'll be d—d if I do it; I am going to guard her, and she shall not leave this house to-night." He then lit the lamp, came to the bed, and said: "I want another good look at the d—d little strumpet." Mrs. Fitzgerald then said to the defendant: "I want to know what you are doing to-night, anyhow?" to which the defendant replied: "I am only trying her; I wanted to see if she is the kind of a girl I have heard she is. She has been cutting up here a long time, and you have been jealous of me and her. Now it has got to stop, and I mean to guard her here all night." Mrs. Fitzgerald replied that she thought she had reason to be jealous; to which the defendant, cursing her, replied that she had not, and ordered her to shut her mouth. He then extinguished the lamp, saying that he would build a fire, as he had no oil to waste in watching such a thing as witness.

While he was building the fire the defendant ordered witness out of his wife's bed, saying that she made it too warm for the baby. Witness asked her step-mother what she should do. Mrs. Fitzgerald did not advise, but said something about it being too warm for the baby, and witness went back to her bed. Defendant then took a seat on a chair near the witness's bed, and made several attempts to get hold of witness's hand. Witness repulsed him, and told him to guard her at a respectable distance. He replied that he would be d—d if he would, as witness might get away. Witness replied that she had no intention of making an effort to get away; to which the defendant retorted that he did not know what witness might try to do. By this time the fire had burned low, and

Mrs. Fitzgerald got up and lit the lamp. Defendant said to her: "You must be d—d afraid you won't see us." Mrs. Fitzgerald then retired to bed and composed herself so that she could see the witness's bed. Defendant leaned over witness, attempted to persuade her to submit to his carnal process, tried to get hold of witness's hand, and to fondle with her person. Witness threw his hands away, and ordered him to desist. He replied that witness had "promised to receive him in bed that night," which was absolutely untrue. During that evening the defendant had said to witness that he was coming to her bed that night, to which she replied: "No you won't." While urging witness to submit to him the defendant told witness that he knew a nice young man in Hamilton county who would marry her if she would "settle the difficulty." Witness declined to settle her difficulty with defendant on the basis of carnal intercourse, and defendant then told her that the grange would take it up, and settle it under the grange code. Witness replied that her uncle and not the grange would settle it. He then threatened to report the house-breaking on the next morning, and then to tie witness and haul her in his wagon to jail. The witness retorted that he was unable to do it, when he angrily ordered witness to hush up, threatened to jerk her out of bed and stamp her into the floor, and swore that he had put up with witness as long as he would. About this time Mrs. Fitzgerald left the room, and, though it was still at least two hours before day, went to the cow-pen to milk, and the defendant, who had been angling into witness's bed for some little time, got entirely into it. Witness attempted to get up and out of the bed, but defendant caught her shoulders, pulled her backwards down in bed, crushed his hand over her mouth to prevent her from crying out, and said: "If you don't lie still, d—d if I don't shoot you; I have been fooling with you long enough." With his remaining hand and legs, he forced the witness's legs apart, and by main force removed her hand with which she strove to protect her privates, inserted his male member into witness's privates, and, despite witness's resistance and her struggles, reduced by fright and fatigue, he managed by force, and motion of body, to penetrate the witness.

After he accomplished his purpose the defendant got out of bed, went to the front door, opened it and looked out and remarked: "I will bet Melissa has gone to Bowling's." He then came back and said to witness: "I have been trying to get this from you for a long time. You might just as well let me have it at first." He then took his pistol, which was hanging in belt and scabbard from the

foot of his bed, buckled it around him and asked witness if she was going to tell of the affair. Witness was afraid of defendant and was determined to secure his prosecution for the outrage, and, to divert his suspicion of her purpose, she replied that "she did not know that she would tell any one here, but expected to tell her uncle." Defendant replied: "No one need know it. I won't tell it, and I will go to town and stop that prosecution." Defendant then joined his wife at the cow-pen, and the two after a time returned to the house together. Mrs. Fitzgerald put the milk away and went to bed. Defendant lay down on a pallet, and witness sat awhile before the fire, and the balance of the night on the side of her bed with her head in her hands. After breakfast defendant offered his hand, proposed to make friends, and asked witness not to tell. To allay his suspicion as to her purpose, witness took his hand and repeated what she had previously said about telling. Defendant stayed about the place, watching the witness, all day. Witness remained, for the purpose of concealing her purpose of reporting him, until late that evening, when she went to the house of Mr. C. T. Bowling, whose wife was a sister to the defendant's wife. Mr. Bowling did not get home until late that night. Witness asked Mrs. Bowling about the truth of defendant's statement that she had forbidden witness's presence at her house. She was afraid to tell her anything about the outrage at that time. Witness stayed that night at Bowling's house. She went home on the next morning, Sunday, and thence to church with Mr. Jeff Coop. She and Coop took dinner at Mr. Peterson's and witness returned home in the afternoon. Late that evening she and her step-mother went to Bowling's. Mr. Bowling invited witness to go with him to the cow-pen to help him milk. Witness went with him, and told him of the outrage upon her by defendant.

The defendant came to Bowling's house a short time after witness and Bowling got back from the cow-pen, and he, his wife and witness remained over night. Defendant left Bowling's early next morning, but witness and her step-mother, Mrs. Fitzgerald, remained. Mrs. Fitzgerald went home on Tuesday morning, and the witness went to. Mr. Adams's house, where she remained until late in the evening, when she returned to Bowling's and remained until after the defendant's arrest. When defendant was arrested and jailed, the witness went to Mr. Adams's house, where she has since resided. On Tuesday, *en route* from Adams's house back to Bowling's, witness joined Mr. Bowling and Mr. Cartwright in Bowling's field and had a talk with them. On the next day, accompanied by Bowling,

witness went to the office of Justice of the Peace Montgomery, and filed complaint. In March, prior to the outrage, witness told old man Ervin Adams that the defendant had traduced her character, and that, upon the arrival of her uncle, he would have to produce proof of his statements or sign a " lie-bill." Witness's father gave witness two cows when he died. The increase of the cows were sold by defendant and wife, and afterwards were repurchased by the defendant, and put in his own brand. The feet and lower limbs of the witness were badly crippled.

This witness was subjected to a severe and searching cross-examination, but it resulted in no material change of her narrative. The witness stated that she came back to Coryell county from Travis county in order to be with her little half-brother, the son of her father and the defendant's wife. She consulted an attorney of Gatesville about securing a division of her father's estate. She also spoke to her step-mother about it, who expressed herself willing to a division, but said that her husband, the defendant, was not. The witness first heard of defendant's slanderous talk about her late in December, 1884. Witness was sick about Christmas, 1884, but the defendant did not put hot rocks to her feet and warm cloths to her side. Those attentions were bestowed by a lady friend. Witness resented, at all times, after she heard of defendant's talk about her, his attempted familiarities. He offered attentions to the witness which he concealed from his wife. While pressing her to submit to his passion, the defendant proposed that, if witness would do it, he would provide her with a picture gallery in town with which to earn her living; saying that she had nothing and could make a living that way. Witness replied that she could not be hired or induced to engage in fornication. He then threatened her with prosecution for house-breaking, and witness told him to proceed with it. Witness could not say to what distance the defendant penetrated her with his male member, but she knew that he did penetrate her, and that he used his male member and not his finger. He did not pain her. Witness knew that a letter, threatening the defendant if he did not divide the property, was found in the shed room of the house about ten days before the rape. The letter closed with the caricature of a coffin. Witness had no idea from what source that letter originated. She did not recognize the handwriting and did not know who wrote or could have written it. The witness repeated in detail the substance of her testimony in chief, and was excused.

C. T. Bowling was the next witness for the State. He testified

that the wives of himself and the defendant were sisters. Miss Ida Turk came to witness's house on the evening of Saturday, May 30, 1885, the day after the alleged outrage upon her. She was not in her usual high spirits, and witness could plainly observe that there was something preying upon her mind. Ida and her step-mother left witness's house on Sunday morning, but Ida returned late that evening. Ida went with witness, at witness's request, to the cow-pen, and there told witness that the defendant had ravished her. Defendant, his wife and Ida spent that night at the witness's house. Defendant left next day, saying that he was going to Gatesville. Mrs. Fitzgerald and Ida remained at the witness's house all of Monday and Monday night. On Tuesday Mrs. Fitzgerald went home, and Ida went to Dick Adams's. On her way to witness's house from Adams's, Ida came to witness and Cartwright, in wit-ness's field. Next day witness went with Ida to the justice of the peace, and Cartwright went to defendant's house.

Cross-examined, witness said that Ida made her statement to him about the outrage, voluntarily. Witness knew of no particular troubles existing between the defendant and the members of his, defendant's, family. Witness asked Ida about the bill of sale to some of her stock sold by defendant. Witness's present feel-ings for the defendant were not kind, nor had they been since the perpetration of the rape upon Ida.

William Cartwright testified, for the State, that Miss Ida Turk came to the Bowling field on Tuesday and talked to him and Bowl-ing about the outrage. She and Bowling went off together. On . Wednesday, witness went to defendant's place and found him in his field. He appeared very much excited — quite wild, in fact,— and was evidently keeping a watch on the approaches to his house. He asked witness if he knew the whereabouts of Ida Turk. Witness told him that Miss Ida was then at Bowling's. He said in reply: " That girl will tell some tale on me. I saw the very devil in her eye." Defendant was evidently very uneasy.

Cross-examined, the witness stated that he was " pretty full" of the outrage himself, and wanted to see how the defendant looked. He found him looking " skittish " — wild in the eyes. Witness told attorney Vardiman on the examining trial that he heard of the out-rage from Mrs. Fitzgerald, Ida's step-mother, and that, after talking with Mrs. Fitzgerald, he became satisfied that the defendant was guilty.

James Adams testified, for the State, that he was present when defendant was arrested on this charge. Defendant affected igno-

rance of the cause of his arrest, and, on being informed of the charge against him, protested his innocence.

Mrs. Dick Adams testified, for the State, that Miss Ida Turk applied to her in March, 1885, for a place to live until she could hear from her aunt in Travis county. Miss Ida was a permanent cripple, and was not so strong as girls of her age ordinarily are. The State closed.

Mrs. Susan Bowling, wife of C. T. Bowling and sister of Mrs. Fitzgerald, was the first witness for the defense. She testified that Ida Turk did not tell her that the reason why she did not report the outrage sooner than she did was that she was afraid she would not be allowed the use of a pony to ride to church on Sunday, nor did witness tell Mrs. Fitzgerald that Ida made any such statement to her. Early in the spring of 1885, defendant, his wife and Ida stayed all night at Bowling's house. Defendant left first, after breakfast, and Ida left before her step-mother did. Ida was a cripple, and was not so strong as other girls of her age.

John Pennington testified, for the defense, that Mrs. Fitzgerald and he were cousins. Witness had worked for the defendant about a month, and was about his house a great deal. Defendant and all the members always got along pleasantly together, so far as the witness could observe. He never saw any familiarities practiced towards Miss Turk by the defendant. Miss Ida had never appeared to be afraid of defendant. Witness once saw defendant and Ida pulling one another about in play. Miss Ida did about as much of the pulling as the defendant did. They seemed to be about equally matched in the scuffle.

Mrs. Lou Haynes testified, for the defense, that Ida Turk came to her house in March, 1885, hunting a place to live. She said that she was treated badly at Fitzgerald's, and would rather live among " niggers " than at the Fitzgerald house; that defendant was a grand old villain, and that she could and would ruin him. Witness advised her to leave the Fitzgerald house.

Mrs. Melissa N. Fitzgerald, the wife of the defendant, was his next witness. She testified that, at the age of twenty-three, she married John N. Turk, an elderly widower, with one daughter, who was the prosecutrix in this case. Mr. Turk had been dead three years. Witness had two sons by Mr. Turk, but one of whom survives. The witness married the defendant in March, 1884. Eight months after her father's death, Ida went to live with her aunt in Travis county. She returned in August, 1884, and lived in the Fitzgerald household as a member of the family, helping some about.

the house and getting her board free. Ida persisted in a demand for a division of the property left by her father, and witness announced her willingness to submit to a division, if it was lawful. Witness frequently observed what she thought was improper conduct between the defendant and Ida. The latter, after going to bed, sometimes called on defendant to place the covering on her. He frequently pulled her down into his lap, where she would sit for a half hour or more. Ida never resisted the defendant when he pulled her down into his lap, which he frequently did in the witness's presence. On two different occasions witness discovered her sitting in defendant's lap. Witness saw the scuffle testified to by John Pennington. Ida began it, fell down, got mad and scratched defendant's face. Witness came into the house from the cow-pen suddenly on one occasion and found them standing together near the table, the defendant having one arm around Ida. As witness came in, Ida said: "If I did you would get mad again." Witness and Ida went to Bowling's together late in the winter of 1884. Ida left Bowling's and went home before witness did. Witness was jealous of Ida, and watched her and defendant. Ida never talked to witness about her jealousy. Witness's sister, Mrs. Bowling, told the witness that Ida said she did not report the outrage on the morning after it occurred because she was afraid she would not be allowed a horse to ride to church.

Witness was at home, in her bed, on the night of the alleged rape. Defendant and her son, Ida's half-brother, slept on a pallet. Witness had her baby in bed with her, and Ida slept alone in her bed in the same room. Defendant awakened witness about midnight by touching her feet. She found Ida in bed with her, lying behind and next to the wall. Witness asked defendant what he wanted. He did not answer but lit the lamp and told Ida to go back to her bed. Ida asked witness what she should do. Witness did not advise her. Defendant said that he was going to guard Ida. The witness told him that Ida was not going to try to get away. He then said that Ida had promised to entertain him in her bed. Ida denied the promise. Witness then got up and fixed the fire, and defendant remarked that witness seemed very much afraid that she would not see him and Ida. Witness told defendant twice to get up from Ida's bed. Defendant said that he wanted to talk to Ida, and did not want witness to hear him, but would tell witness some time what they had to say. Defendant and Ida whispered. Sometimes Ida would raise her voice, and defendant would say: "You need not speak so loud; I am not out at the cow-pen." De-

fendant was on the bed by Ida some two or three hours. Ida told him twice to get off the bed. Witness did not see defendant's hands on the girl. Defendant had on his pants and socks. Ida was in bed undressed, having on only her chemise and gown. They were saying nothing when the witness left the room, nor were they scuffling. Witness went to the cow-pen and was milking the third cow when she was joined by the defendant. She and defendant returned to the house together and found Ida sitting quietly by the fire, with her head in her hands, a frequent habit of hers. Witness and Ida both lay down, and defendant retired to his pallet on the floor. Within three-quarters of an hour, witness arose and prepared breakfast. Ida ate no breakfast. She very frequently ate no breakfast in the morning. She was not crying, that witness could see, when she returned from the cow-pen, nor did she complain to witness. Ida's general conduct in the presence of the defendant was such as would lead an ordinary man to suspect her virtue. She would put her gown on in his presence, untie her garters, and put her hands in her bosom and scratch first one breast and then the other while he was sitting by. She said that she meant no harm, and the defendant always protested that he meant no harm in the liberties he took with her.

Witness saw nothing unusual in Ida's conduct or appearance when she returned from Bowling's house on the Sunday morning after the alleged outrage. She asked witness to get her a horse to ride to church, which the defendant did, and she went to church with Jeff Coop, returned with him, and ate lunch at witness's house. Ida was not in the least afraid of the defendant. On the contrary she attempted to fight him for punishing her half-brother, whom she apparently loved very devotedly. Witness left the room just before the alleged outrage, because she did not see that she could do any good by staying. Ida was never satisfied at the witness's house, and always wanted to get back to her aunt's. Ida told witness that defendant was trying to disgrace her by circulating false rumors about her. Witness spoke to defendant about it in Ida's presence, and he denied it. Ida at that time hunted four days for a temporary home. Witness offered her money to go home on. She refused, saying that she would not go until after court. The prosecution for housebreaking was talked of then by the defendant. Ida dressed in the shed room on Sunday morning, May 30, 1885. Witness three times examined her discarded under clothes — chemise and gown,— but discovered no blood or stains.

Cross-examined, the witness stated that, when she got back into

bed from making the fire (before she went to the cow-pen), and arranged herself to see the whole of Ida's bed, the defendant was lying down with Ida. The girl twice told him to go away. The witness appealed to him to go away and let the girl alone. She was satisfied that he intended wrong, but she was powerless to protect the girl. Witness did not know of the charge against the defendant when she examined Ida's chemise, but knew of defendant's conduct up to the time she left the house and went to the cow-pen.. Witness left the room because she was afraid of the defendant. Defendant went to Gatesville on Monday and did not return until Tuesday night. William Cartwright was at witness's house on Wednesday, and asked witness if she saw anything wrong on the night of the alleged rape. Witness did not tell him all she saw. In reply to what witness told him Cartwright said: "That is all I want to know; that is enough." Witness did not tell Cartwright that the defendant, at the cow-pen, told her that he would "not do so any more." She did not tell Cartwright that she had never seen anything wrong in Ida's conduct except going with young men to parties at night. She did not agree with Cartwright to keep defendant tame and unsuspicious until he could be arrested, nor did she ask Cartwright to stay at her house on Wednesday night because she was afraid of defendant. She did not tell Cartwright that defendant was guilty. She did not tell defendant about the charge against him. Ida told witness on Tuesday that she was going to have defendant arrested, but witness did not believe that she was, in fact, going to do it.

Re-examined, witness said that, in testifying that she left the room through fear, she did not mean that she was afraid of personal violence, but was afraid that she would witness a very improper proceeding between defendant and Ida. Re-crossed, witness said that she was afraid to bother or oppose defendant on that night. She was afraid of both defendant and Ida.

Mrs. Mary Faubion, the defendant's sister, testified in his behalf that Mrs. Fitzgerald and Miss Ida Turk came to her house one day in February, 1885, leaving defendant at home skinning a cow. Ida advanced several different reasons why it was necessary for her to go back home shortly after her arrival. She did not go, because there was no horse up at the time. Ida abused defendant severely once at witness's house, to his face, for not keeping up a horse for her use. She was no more afraid of defendant than witness was, and the witness had never yet seen the man she feared. Defendant was a weak and not a robust man. The defense closed.

William Cartwright was recalled by the State. He testified in rebuttal that immediately after he left the defendant in his field on the Wednesday succeeding the night of the alleged outrage, he had an interview with Mrs. Melissa Fitzgerald. Mrs. Fitzgerald told the witness in that interview that she knew of the charge against the defendant, and that he was guilty. She and witness agreed to keep the defendant unsuspicious of the charge until his arrest, and they were to do so by talking to him in a manner to preserve his good humor. She asked witness to stay at her house that night, as it was possible that the officer to arrest defendant might come. Witness asked Mrs. Fitzgerald if it was true that defendant had been imposing on Ida. She replied that it was true; that the defendant cursed her and Ida, and made Ida go back to her own bed; that Ida asked her for protection, and that she declined to interfere because she was afraid to imperil her own life. She said that she believed Ida to be virtuous, and that she had never seen anything in her conduct to object to, except that she sometimes accompanied young men to parties at night. She said, also, that the defendant, at the cow-pen, told her that if she would forgive him, he would not do so again.

Cross-examined, the witness stated that the Bowling household and defendant's folks got along well together, but those at Bowling's did not like the way in which the defendant was behaving. The defendant spent some time "pumping" around the men about Ida's character. Witness thought that he could discover a motive, or passion, in defendant's attempts to play with and fondle Ida, which the girl always resented in witness's presence. He thought defendant's conduct towards Ida aroused Mrs. Fitzgerald's jealousy. When witness went to defendant's house on Wednesday, he was mad. He went there to get the truth, and was satisfied he got it from Mrs. Fitzgerald, who was then as mad as he.

Jeff Coop testified, for the State, that he attended church with Miss Ida on Sunday, May 31, 1885. Ordinarily Miss Ida was very lively and animated company. On this occasion her demeanor was the exact reverse. She was downcast, silent and evidently in mental distress, speaking only to answer yes or no to questions.

The motion for new trial assailed the verdict as unsupported by the testimony, and denounced the trial as unfair because conducted in the presence of spectators who applauded the State's attorney in the denunciation of the defendant.

The commendation bestowed upon the instructions of the trial judge by the opinion of this court suggests the propriety of incor-

porating the charge in full in this report. Caption omitted, and bearing in mind that it purposely ignores rapes accomplished by fraud, it reads as follows:

"1. The indictment in this case charges the defendant, Reuben Fitzgerald, with the offense of rape, alleged to have been committed in Coryell county, Texas, on the 30th day of May, A. D. 1885, on the person of Ida Turk, a female:

"2. Rape is the carnal knowledge of a woman without her consent, obtained by force or threats. The force employed to obtain such carnal knowledge must be such as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case. The threats employed must be such as might reasonably create a just fear of death or great bodily harm, in view of the relative condition of the parties, as to health, strength and all other circumstances of the case.

"3. To constitute the crime of rape it is necessary that penetration be shown, but, if penetration be shown to have actually taken place as a matter of fact, the degree of penetration is immaterial.

"4. But, further, to constitute rape there must be an assault. Now the use of any unlawful violence upon the person of another, with intent to injure him, whatever be the means or degree of violence used, is an assault and battery. Any attempt to commit a battery, or any threatening gesture, showing in itself, or by words accompanying it, an immediate intention coupled with an ability to commit a battery, is an assault. The injury intended may be either bodily pain, constraint or sense of shame, or other disagreeable emotion of the mind.

"5. In this case, gentlemen, to warrant the conviction of the defendant of rape, it should appear from the evidence:

"First. That the defendant, Reuben Fitzgerald, in Coryell county, Texas, on or about the 30th day of May, A. D. 1885, made an assault upon the alleged female, Ida Turk.

"Second. That by such assault and by actual force and threats as above defined, the defendant obtained carnal knowledge of the said Ida Turk by actual penetration.

"Third. That such carnal knowledge of the said Ida Turk was obtained by the defendant without her consent and against her will.

"6. If you find the defendant guilty of rape, you will say so by your verdict, and assess his punishment at death or confinement in the penitentiary for life, or for any term of years not less than five, in your discretion.

"7. But if you should find that the defendant did not, as alleged, have carnal knowledge of the said Ida Turk by actual penetration; that is, if you believe that actual penetration has not been shown beyond a reasonable doubt, but should believe from the evidence that the defendant did, in the county, and at or about the time laid in the indictment, make an assault upon the said Ida Turk, with the intent to commit the crime of rape, that is, with intent, by force or threats, to have carnal knowledge with Ida Turk, without her consent and against her will, you will in that event find the defendant guilty of assault with the intent to commit the offense of rape, and assess his punishment at confinement in the penitentiary for any period not less than two nor more than seven years.

" 8. But if you believe from the evidence that there was not such penetration, but that the defendant made an assault upon the person of Ida Turk, not with intent to commit rape upon her, but with intent to have sexual intercourse with her, with her consent, then you will find the defendant guilty of an aggravated assault, and assess his punishment at a fine in any sum not less than twenty-five nor more than one thousand dollars, or at imprisonment in the county jail, not less than one month, nor more than two years.

" 9. If you believe from the evidence that the defendant did, as charged, have carnal knowledge of the alleged Ida Turk, but have a reasonable doubt as to whether such carnal knowledge was obtained with Ida Turk's consent, the defendant should be acquitted. Further, as to the offense of rape, the defendant should be acquitted of this offense, if the evidence fails to establish, beyond a reasonable doubt, the sufficiency of the alleged force and threats, as above explained, that is, their sufficiency as means to accomplish the alleged carnal knowledge within the meaning of the explanation before given.

" 10. If you believe, gentlemen, beyond a reasonable doubt that the defendant is guilty either of rape; or assault with the intent to commit the offense of rape, but have a reasonable doubt as to whether he is guilty of the one or the other of these offenses, you will give him the benefit of such doubt, and find him guilty of assault with intent to rape.

"11. If you should acquit the defendant of rape, but should believe beyond a reasonable doubt that he is either guilty of assault with the intent to commit the offense of rape, or aggravated assault, but should have a reasonable doubt as to whether he is guilty of the one or the other of these offenses, you will give him the benefit of such doubt, and find him guilty of aggravated assault.

"12. The law, gentlemen, presumes the defendant to be innocent until his guilt is established by legal and competent evidence. You are the exclusive judges of the facts proved, the weight to be given to the testimony and the credibility of the witnesses. If, therefore, after considering the evidence before you, and the law as laid down in the foregoing instructions, you should have a reasonable doubt of the defendant's guilt, you will give him the benefit of such doubt and acquit him."

No brief for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. Appellant was convicted in the lower court of rape, and his punishment was affixed at a life term in the penitentiary. As disclosed by the record, the evidence amply sustains the verdict and judgment; the law of the case was most fully and fairly given upon all the different phases in the court's charge to the jury, and as favorably to the defendant as he had the right to demand; there were no additional instructions asked; there was no bill of exceptions saved to any supposed error in the ruling of the court. In a word, the trial appears in every respect to have been a fair and impartial one.

There is nothing presented on this appeal which requires discussion; wherefore the judgment is affirmed.

*Affirmed.*